Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co.,
GEICO Indemnity Co, GEICO General Insurance Company
and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | 15-cv-4818 |
| | Docket No.:_____ (        ) |
| Plaintiffs, | |
| -against- | |
| LLJ THERAPEUTIC SERVICES, P.T. P.C., DUNAMIS REHAB PT P.C., SYNOPTIC PHYSICAL THERAPY P.C., REHAB CHOICE CORP., NR MOTION PT P.C., REHABXPRESS PT P.C., ROM MEDICAL P.C., LEAH MAY RUFINO, ALMIRA SIGRID GALDO, CLARISA J. CONTRERAS-CANCIO, NORMAN A. ROQUE, DANA HONTIVEROS, MICHELLE NATIVIDAD, LILY ZARHIN, M.D., | **Plaintiff Demands a Trial by Jury** |
| -and- | |
| GREGORY MIKHALOV also known as GREGORY MIKHAILOV, ARKADY SEIFER, IGOR FARBEROV, and JOHN DOE DEFENDANTS 1-10, | |
| Defendants. | |

------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to recover more than $2,740,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to bogus healthcare services, including range of motion testing, muscle testing, and activity limitation measurement ("ALM") testing (collectively the "Fraudulent Services"), allegedly provided to New York automobile accident victims ("Insureds"). The Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons who illegally owned and controlled seven transient professional corporations: LLJ THERAPEUTIC SERVICES, P.T. P.C. ("LLJ Therapeutic"), DUNAMIS REHAB PT P.C. ("Dunamis"), SYNOPTIC PHYSICAL THERAPY P.C. ("Synoptic"), REHAB CHOICE CORP. ("Rehab Choice"), NR MOTION PT P.C. ("NR Motion"), REHABXPRESS PT P.C. ("Rehabxpress"), ROM MEDICAL P.C. ("ROM Medical") (collectively the "Provider Defendants").

2. The Provider Defendants purport to be seven separate and independently owned professional healthcare corporations, but none of them have had legitimate licensed professionals as owners; none of them maintained stand-alone practices; none of them have had patients of their own; and none of them were lawfully licensed and legally operating. In fact, though each Provider Defendant has a licensed professional listed as the record owner, none of the purported owners actually provided services for the Provider Defendants or engaged in the practice of their profession through the professional corporations.

3. The Provider Defendants have, in fact, been truly owned and controlled by unlicensed laypersons, who used them to operate on a transient basis at a series of multi-disciplinary healthcare clinics where, in return for payments for referrals and/or kickbacks, the Provider Defendants were given access to New York automobile accident victims insured by

2

GEICO ("Insureds") in order to (i) perform, or purport to perform, the Fraudulent Services and (ii) financially enrich themselves by exploiting the Insureds' no-fault insurance benefits.

4.      In addition to seeking recovery of the monies stolen from it, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $3,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the Provider Defendants, because:

(i)      The Provider Defendants were fraudulently incorporated and/or unlawfully owned and controlled by non-medical professionals and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(ii)     in the case of Rehab Choice Corp., the Provider Defendant purported to provide the Fraudulent Services despite the fact that it was never licensed to render professional medical services in New York;

(iii)    the Fraudulent Services were provided pursuant to testing and billing protocols imposed by unlicensed laypersons;

(iv)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(v)      the Fraudulent Services were provided pursuant to illegal kickback arrangements amongst the Defendants and the owners and controllers of the multi-disciplinary no-fault clinics (the "Clinics") where the Defendants purported to provide the Fraudulent Services;

(vi)     in virtually every case, the Fraudulent Services were provided by independent contractors, rather than by the Provider Defendants' employees;

(vii)    the Provider Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits; and,

(viii)   the Fraudulent Services were provided through professional corporations that were ineligible to bill for or to collect no-fault benefits because they were nominally owned on paper by medical professionals who did not actually practice through the professional corporations they purported to own.

5.      The Defendants fall into the following categories:

(i)     The Provider Defendants are medical professional corporations (or in one case, a general business corporation not authorized to provide healthcare services) through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Lily Zarhin, M.D. ("Zarhin") is a licensed physician, and Michelle Natividad ("Natividad"), Dana Hontiveros ("Hontiveros"), Norman A. Roque ("Roque"), Clarisa J. Conteras-Cancio ("Contreras-Cancio"), Almira Sigrid Galdo ("Galdo"), and Leah May Rufino ("Rufino") (collectively the "Nominal Owner Defendants") are licensed physical therapists, who falsely purported to won the Provider Defendants.

(iii)   Defendants Gregory Mikhalov ("Mikhalov"), Arkady Seifer ("Seifer"), Igor Farberov ("Farberov"), and John Doe Defendants 1-10 (collectively the "Management Defendants") illegally own and control the Provider Defendants, paid kickbacks for patient referrals to the owners and controllers of the multi-disciplinary no-fault clinics from which the Provider Defendants operated, and caused Insureds to be subjected to the Fraudulent Services.

6.      As discussed below, Defendants at all relevant times have known that:

(i)     The Provider Defendants were fraudulently incorporated and/or unlawfully owned and controlled by non-medical professionals and, therefore, were ineligible to bill for or to collect No-Fault Benefits;

(ii)    in the case of Rehab Choice Corp., the Provider Defendant purported to provide the Fraudulent Services despite the fact that it was never licensed to render professional medical services in New York;

(iii)   the Fraudulent Services were provided – to the extent they were provided at all – pursuant to testing and billing protocols imposed by unlicensed laypersons;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(v)     the Fraudulent Services were provided – to the extent they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and the owners and controllers of the Clinics where the Defendants purported to provide the Fraudulent Services;

(vi)    in virtually every case, the Fraudulent Services – to the extent they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees;

(vii)    the Provider Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits; and

(viii)    the Fraudulent Services were provided – to the extent they were provided at all – through professional corporations that were ineligible to bill for or to collect no-fault benefits because they were nominally owned on paper by medical professionals who did not actually practice through the professional corporations they purported to own.

7.    As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

8.    The charts  and sample medical bills annexed hereto as Exhibits "1" – "14" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

9.    The Defendants' fraudulent scheme began as early as 2010 and continued uninterrupted through present day. As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,740,000.00

## THE PARTIES

**I.    Plaintiffs**

10.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.    Defendants**

11.    Defendant Zarhin resides in and is a citizen of Pennsylvania. Zarhin was licensed to practice medicine in New York on May 16, 2006, purported to own Defendant ROM Medical, and purported to provide many of the Fraudulent Services.

12. Defendant ROM Medical is a New York medical professional corporation with its principal place of business at 2238 East 59th Place, Brooklyn, New York, through which the Fraudulent Services have been billed to GEICO. ROM Medical was incorporated on September 18, 2008, and nominally is owned on paper by Zarhin, but in actuality has been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law since at least January 3, 2011. ROM Medical has operated on a transient basis from at least twenty-seven different multi-disciplinary no-fault clinics.

13. Defendant Natividad resides in and is a citizen of California. Natividad was licensed to practice physical therapy in New York on September 25, 2006, purported to own Defendant Rehabxpress, and purported to provide many of the Fraudulent Services.

14. Defendant Rehabxpress is a New York physical therapy professional corporation with its principal place of business at 8685 102nd Street, Richmond Hill, New York, through which the Fraudulent Services have been billed to GEICO. Rehabxpress was incorporated on January 31, 2008, and nominally is owned on paper by Natividad, but in actuality has been fraudulently owned and controlled by unlicensed non-medical professionals in contravention of New York law since at least June 21, 2011. Rehabxpress has operated on a transient basis from at least twelve different multi-disciplinary no-fault clinics.

15. Defendant Hontiveros resides in and is a citizen of New Jersey. Hontiveros was licensed to practice physical therapy in New York on October 31, 2002, purported to own Defendant Rehab Choice Corp., and purported to provide many of the Fraudulent Services.

16. Hontiveros was formerly known as Dexter Torredes Hontiveros. In early 2014, Hontiveros was granted judgment in the Superior Court of New Jersey, County of Hudson authorizing Hontiveros to assume the name of "Dana Hontiveros". A copy of the complaint and subsequent judgment are annexed hereto as Exhibit "15".

6

17.     Defendant Rehab Choice Corp. is a New Jersey general business corporation through which the Fraudulent Services have been billed to GEICO.  Rehab Choice Corp. has never been licensed to render professional medical services in New York but, nevertheless, submitted billing to New York no-fault insurers for services purportedly performed in New York. Rehab Choice Corp. was incorporated on October 5, 2007, and nominally is owned on paper by Hontiveros, but in actuality has been owned and controlled by unlicensed non-medical professionals since at least June 28, 2011. Rehab Choice Corp. has operated on a transient basis from at least eight different multi-disciplinary no-fault clinics.

18.     Defendant Roque resides in and is a citizen of New York. Roque was licensed to practice physical therapy in New York on February 10, 1999, purported to own Defendant NR Motion, and purported to provide many of the Fraudulent Services.

19.     Defendant NR Motion is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at 166 Clove Road, Staten Island, New York, through which the Fraudulent Services have been billed to GEICO.  NR Motion was fraudulently incorporated on August 28, 2012, and nominally is owned on paper by Roque, but in actuality has always been owned and controlled by unlicensed non-medical professionals in contravention of New York law. NR Motion has operated on a transient basis from at least fourteen different multi-disciplinary no-fault clinics.

20.     Defendant Contreras-Cancio resides in and is a citizen of New York. Contreras-Cancio was licensed to practice physical therapy in New York on April 20, 2000, purported to own Defendant Synoptic, and purported to provide many of the Fraudulent Services.

21.     Defendant Synoptic is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at 131 Beacon Lane, Bronx, New York, through which the Fraudulent Services have been billed to GEICO.  Synoptic was

7

fraudulently incorporated on May 3, 2013, and nominally is owned on paper by Contreras-Cancio, but in actuality has always been owned and controlled by unlicensed non-medical professionals in contravention of New York law. Synoptic has operated on a transient basis from at least seventeen different multi-disciplinary no-fault clinics.

22.     Defendant Galdo resides in and is a citizen of New York. Galdo was licensed to practice physical therapy in New York on November 30, 2009, purported to own Defendant Dunamis, and purported to provide many of the Fraudulent Services.

23.     Defendant Dunamis is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at 2155 Bolton St, Bronx, New York, through which the Fraudulent Services have been billed to GEICO.   Dunamis was fraudulently incorporated on October 11, 2013, and nominally is owned on paper by Galdo, but in actuality has always been owned and controlled by unlicensed non-medical professionals in contravention of New York law. Dunamis has operated on a transient basis from at least eighteen different multi-disciplinary no-fault clinics.

24.     Defendant Rufino resides in and is a citizen of New York. Rufino was licensed to practice physical therapy in New York on October 8, 2003, purported to own Defendant LLJ Therapeutic, and purported to provide many of the Fraudulent Services.

25.     Defendant LLJ Therapeutic is a fraudulently incorporated New York physical therapy professional corporation with its principal place of business at 25-30 14th Street, 2nd Floor, Astoria, New York, through which the Fraudulent Services have been billed to GEICO. LLJ Therapeutic was fraudulently incorporated on August 7, 2014, and nominally is owned on paper by Rufino, but in actuality has always been owned and controlled by unlicensed non-medical professionals in contravention of New York law. LLJ Therapeutic has operated on a transient basis from at least twenty-six different multi-disciplinary no-fault clinics.

26.     Defendant Mikhalov resides in and is a citizen of New Jersey. Mikhalov has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the Provider Defendants, and split fees with the Provider Defendants, in contravention of New York Law.

27.     Mikhalov was indicted on or about February 29, 2012, in the United States District Court for the Southern District of New York (the "Zemlyansky Indictment"), and charged with two or more crimes, including RICO Conspiracy, Conspiracy to Commit Health Care Fraud, Conspiracy to Commit Mail Fraud and Conspiracy to Commit Money Laundering, committed in connection with a systematic scheme to defraud New York automobile insurance companies of more than $279 million under New York's No-Fault insurance laws. United States v. Zemlyansky, 12-CR-0017 (S.D.N.Y. 2012). The Zemlyansky Indictment averred that Mikhalov and others participated in a vast RICO criminal enterprise whereby non-professionals controlled medical practices (akin to the allegations in this case) by paying licensed medical practitioners to use their licenses to incorporate the professional corporations. See id. In or about March 2013, Mikhalov entered into a plea agreement with Office of the United States Attorney for the Southern District of New York wherein he agreed to plead guilty to conspiracy to commit healthcare fraud. See Exhibit "16".

28.     Defendant Seifer resides in and is a citizen of New York. Seifer has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from the Provider Defendants, and split fees with the Provider Defendants, in contravention of New York Law.

29.     Defendant Farberov resides in and is a citizen of New York. Farberov has never been a licensed medical professional, yet owned, controlled, and derived economic benefit from

the Provider Defendants, and split fees with the Provider Defendants, in contravention of New York Law.

30.     Upon information and belief, John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed medical professionals, yet – together with Mikhalov, Seifer, and Farberov – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law, and have split fees with the Provider Defendants in contravention of New York law.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.  Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

32.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.  **An Overview of the No-Fault Laws and Licensing Statutes**

33.     GEICO underwrites automobile insurance in New York.

34.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

35.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, chiropractic services, physical therapy services, and acupuncture services.

36.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

37.     Under New York law, general business corporations may not bill for professional services, including health care services.

38.     Under New York law, foreign corporations may not do any business in New York without receiving authorization from the department of state.

39.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

40.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

41.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

42.     New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals.

43.     Additionally, New York law requires the shareholders of a medical professional corporation to be engaged in the practice of the profession through the professional corporation in order for it to be lawfully licensed.

44.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful

fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if its record owner does not practice his or her profession through the professional corporation.

45.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

46.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

47.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

48.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   The Defendants' Fraudulent Scheme

49.    Beginning in late 2010, Defendants masterminded and implemented a series of interrelated, complex fraudulent schemes wherein the Provider Defendants – owned on paper by the Nominal Owner Defendants, but actually illegally owned and controlled by the Management Defendants – were used to bill GEICO and the New York automobile insurance industry for millions of dollars in no-fault insurance benefits they were never entitled to receive.

50.    As early as late 2010, the Management Defendants commenced a search for licensed medical professionals who would be willing to sell the use of their professional licenses to the Management Defendants so that the Management Defendants could either: (i) illegally operate and control a medical professional corporation previously incorporated by the medical professional; or (ii) fraudulently incorporate a new medical professional corporation under the medical professional's name. The Management Defendants sought to purchase the use of these professional licenses in order to submit large-scale fraudulent no-fault billing to New York no-fault insurers.

51.    Beginning in late 2010, the Management Defendants recruited Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, and Rufino, one licensed physician and six licensed physical therapists, who were all willing to sell to the Management Defendants the use of their professional licenses, so that the Management Defendants could: (i) illegally own and operate preexisting corporations, ROM Medical, Rehabxpress, and Rehab Choice Corp.; and (ii) fraudulently incorporate NR Motion, Synoptic, Dunamis, and LLJ Therapeutic.

52.     The Provider Defendants did not advertise or market their services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.  Instead, the Provider Defendants operated from a series of multidisciplinary clinics, i.e., the Clinics, where the owners and controllers of the Clinics arranged for Insureds who presented to the Clinics to be referred to the Provider Defendants in exchange for payments, i.e., kickbacks, from the Management Defendants.

53.     The Nominal Owner Defendants were never the genuine owners of the Provider Defendants, as they did nothing to aid the start-up of the transient "practices" operated under the names of the Provider Defendants, did nothing to cultivate a patient base, did nothing to treat or care for any of the patients of the Provider Defendants, and had no control over the operations or finances of the Provider Defendants.

54.     In keeping with the fact that the Provider Defendants were all operated under the common ownership and control of the Management Defendants and that the Defendants' testing and billing protocol was instituted by unlicensed laypersons, virtually every Insured was provided with the same *verbatim* diagnosis.  Specifically, the Provider Defendants (though purporting to be seven, separately owned and operated Providers) purported to diagnosis virtually every Insured with the exact same "Traumatic Lumbar paraspinal myofascitis with S1 discogenic radiculopathy and ext."

**A.     The Fraudulent Incorporation of the Individual Provider Defendants**

**1.     The Purchase of Zarhin's License and Ownership of ROM Medical**

55.     In late 2010, the Management Defendants recruited Zarhin, a licensed physician who was willing to sell them the use of her medical license as well as complete ownership and

control of ROM Medical, an inactive, preexisting medical professional corporation formed in 2008.

56. In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Zarhin, wherein, in exchange for a designated salary or other form of compensation, Zarhin agreed to falsely represent in the triennial statements filed with the Education Department, that she was the true shareholder, director, and officer of ROM Medical and that she truly owned, controlled, and practiced through ROM Medical. Zarhin did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

57. The Management Defendants – rather than Zarhin – provided all costs associated with establishing ROM Medical in the Clinics, and all investment in ROM Medical subsequent to the purchase of Zarhin's medical license by the Management Defendants in late 2010. Zarhin did not incur any costs to establish ROM Medical's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her medical license by the Management Defendants.

58. Thereafter, the Management Defendants caused ROM Medical to commence operations on a transient basis from at least twenty-seven different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those Clinics in exchange for patient referrals to ROM Medical.

59. Zarhin was no longer the true shareholder, director, or officer of ROM Medical, and no longer had any true ownership interest in or control over the professional corporation. Subsequent to the purchase of Zarhin's medical license, true ownership and control over ROM Medical always rested entirely with the Management Defendants, who used the façade of ROM Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ medical

16

professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

60.    Subsequent to the purchase of her medical license by the Management Defendants, Zarhin exercised absolutely no control over or ownership interest in ROM Medical. All decision-making authority relating to the operation and management of ROM Medical was vested entirely with the Management Defendants.

61.    In addition, subsequent to the purchase of her medical license by the Management Defendants, Zarhin did not control or maintain any of ROM Medical's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of ROM Medical's financial affairs; never hired or supervised any of ROM Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how ROM Medical operated.

62.    In keeping with the fact that Zarhin exercised no genuine ownership interest in or control over ROM Medical, she never actually practiced medicine through ROM Medical subsequent to December 2009.

63.    Zarhin is no stranger to fraudulent schemes.  In fact, GEICO has received billing from Zarhin for no fault charges in connection with more than 25 different providers, including two providers (Accurate Medical Diagnostics PC and DST Medical PC) that were identified by the United States Government as being used as part of a massive scheme to defraud New York automobile insurance companies of hundreds of millions of dollars. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO).

### 2.    The Purchase of Natividad's License and Ownership of Rehabxpress

64.    In mid-2011, the Management Defendants recruited Natividad, a licensed physical therapist who was willing to sell them the use of her physical therapy license as well as complete

ownership and control of Rehabxpress, an inactive, preexisting physical therapy professional corporation formed in 2008.

65.     In order to circumvent New York law preventing non-medical professionals from owning and controlling medical professional corporations, the Management Defendants entered into a secret scheme with Natividad, wherein, in exchange for a designated salary or other form of compensation, Natividad agreed to falsely represent in the triennial statements filed with the Education Department, that she was the true shareholder, director, and officer of Rehabxpress and that she truly owned, controlled, and practiced through Rehabxpress. Natividad did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

66.     The Management Defendants – rather than Natividad – provided all costs associated with establishing Rehabxpress in the Clinics, and all investment in Rehabxpress subsequent to the purchase of Natividad's medical license by the Management Defendants in mid-2011. Natividad did not incur any costs to establish Rehabxpress's practice, nor did she invest any money in the professional corporation she purportedly owned subsequent to the purchase of her physical therapy license by the Management Defendants.

67.     Thereafter, the Management Defendants caused Rehabxpress to commence operations on a transient basis from at least twelve different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those Clinics in exchange for patient referrals to Rehabxpress.

68.     Natividad was no longer the true shareholder, director, or officer of Rehabxpress, and no longer had any true ownership interest in or control over the professional corporation. Subsequent to the purchase of Natividad's physical therapy license, true ownership and control over Rehabxpress always rested entirely with the Management Defendants, who used the façade of Rehabxpress to do indirectly what they were forbidden from doing directly, namely: (i) employ

medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

69.     Subsequent to the purchase of her physical therapy license by the Management Defendants, Natividad exercised absolutely no control over or ownership interest in Rehabxpress. All decision-making authority relating to the operation and management of Rehabxpress was vested entirely with the Management Defendants.

70.     In addition, subsequent to the purchase of her physical therapy license by the Management Defendants, Natividad did not control or maintain any of Rehabxpress's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Rehabxpress's financial affairs; never hired or supervised any of Rehabxpress's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Rehabxpress operated.

71.     In keeping with the fact that Natividad exercised no genuine ownership interest in or control over Rehabxpress, she never actually practiced physical therapy through Rehabxpress subsequent to August 2009.

3.      **The Purchase of Hontiveros's License and Ownership of Rehab Choice Corp.**

72.     In mid-2011, the Management Defendants recruited Hontiveros, a licensed physical therapist who was willing to sell them the use of his physical therapy license as well as complete ownership and control of Rehab Choice Corp., an inactive, preexisting New Jersey corporation formed in 2007. Hontiveros agreed to transfer complete ownership and control of Rehab Choice Corp. to the Management Defendants in exchange for a designated salary or other form of compensation. Hontiveros did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

19

73.    The Management Defendants then caused Rehab Choice Corp. to begin seeing patients in New York, despite the fact that Rehab Choice Corp. was never licensed to render professional medical services in New York, and ineligible to collect New York no-fault benefits.

74.    The Management Defendants – rather than Hontiveros – provided all costs associated with establishing Rehab Choice Corp. in the Clinics, and all investment in Rehab Choice Corp. subsequent to the purchase of Hontiveros's physical therapy license by the Management Defendants in mid-2011. Hontiveros did not incur any costs to establish Rehab Choice Corp.'s practice, nor did he invest any money in the corporation he purportedly owned subsequent to the purchase of his physical therapy license by the Management Defendants.

75.    The Management Defendants caused Rehab Choice Corp. to commence operations on a transient basis from at least twelve different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those Clinics in exchange for patient referrals to Rehab Choice Corp.

76.    Hontiveros was no longer the true shareholder, director, or officer of Rehab Choice Corp., and no longer had any true ownership interest in or control over the corporation. Subsequent to the purchase of Hontiveros's physical therapy license, true ownership and control over Rehab Choice Corp. always rested entirely with the Management Defendants, who used the façade of Rehab Choice Corp. to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

77.    Subsequent to the purchase of his physical therapy license by the Management Defendants, Hontiveros exercised absolutely no control over or ownership interest in Rehab Choice Corp. All decision-making authority relating to the operation and management of Rehab Choice Corp. was vested entirely with the Management Defendants.

20

78.     In addition, subsequent to the purchase of his medical license by the Management Defendants, Hontiveros did not control or maintain any of Rehab Choice Corp.'s books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Rehab Choice Corp.'s financial affairs; never hired or supervised any of Rehab Choice Corp.'s employees or independent contractors; and was completely unaware of the most fundamental aspects of how Rehab Choice Corp. operated.

79.     In keeping with the fact that Hontiveros exercised no genuine ownership interest in or control over Rehab Choice Corp., he never actually practiced physical therapy through Rehab Choice Corp.

### 4.     Rehab Choice, P.T., P.C. and the Management Defendants' Efforts to Conceal Rehab Choice Corp.'s Ineligibility to Collect No-Fault Benefits

80.     In connection with his guilty plea in the Zemlyansky case, Mikhalov signed a plea agreement acknowledging that he controlled a New York professional corporation named Rehab Choice, P.T., P.C. See Exhibit "16". In fact, in motion papers filed in the Zemlyansky case, the Government averred that both Mikhalov and Hontiveros were associated with Rehab Choice, P.T., P.C. See Exhibit "17". However, Hontiveros and the Management Defendants never actually submitted or caused to be submitted any billing through Rehab Choice, P.T., P.C. to GEICO or any other New York insurer. Rather, the Defendants submitted documents, including assignments of benefits, which falsely represented that the Fraudulent Services were performed by Rehab Choice, P.T., P.C., but directed insurers to remit payment to Rehab Choice Corp., an unlicensed New Jersey corporation.

81.     The Management Defendants falsely represented that the services were performed by Rehab Choice, P.T., P.C., a New York professional corporation, because they sought to disguise the fact that Rehab Choice Corp. was ineligible to collect New York no-fault benefits

**5.     The Fraudulent Incorporation of NR Motion**

82.     In mid-2012, the Management Defendants recruited Roque, a licensed physical therapist who was willing to sell them the use of his physical therapy license so that they could fraudulently incorporate NR Motion.

83.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing NR Motion to operate a physical therapy practice, the Management Defendants entered into a secret scheme with Roque. In exchange for a designated salary or other form of compensation from the Management Defendants, in mid-2012 Roque agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the triennial statements filed thereafter, that he was the true shareholder, director, and officer of NR Motion and that he truly owned, controlled, and practiced through the professional corporation. Roque did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

84.     Once NR Motion was fraudulently incorporated on August 28, 2012, Roque ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

85.     The Management Defendants – rather than Roque – provided all start-up costs and investment in NR Motion. Roque did not incur any costs to establish NR Motion's practice, nor did he invest any money in the professional corporation he purportedly owned.

86.     Thereafter, the Management Defendants caused NR Motion to commence operations on a transient basis from at least fourteen different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those clinics in exchange for patient referrals to NR Motion.

87.     Roque never was the true shareholder, director, or officer of NR Motion, and never had any true ownership interest in or control over the professional corporation. True ownership and

control over NR Motion always rested entirely with the Management Defendants, who used the façade of NR Motion to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

88.     Roque exercised absolutely no control over or ownership interest in NR Motion. All decision-making authority relating to the operation and management of NR Motion was vested entirely with the Management Defendants.

89.     In addition, Roque never controlled or maintained any of NR Motion's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of NR Motion's financial affairs; never hired or supervised any of NR Motion's employees or independent contractors; and was completely unaware of the most fundamental aspects of how NR Motion operated.

90.     In keeping with the fact that Roque exercised no genuine ownership interest in or control over NR Motion, he never actually practiced physical therapy through NR Motion.

**6.      The Fraudulent Incorporation of Synoptic**

91.     In early 2013, the Management Defendants recruited Contreras-Cancio, a licensed physical therapist who was willing to sell them the use of her physical therapy license so that they could fraudulently incorporate Synoptic.

92.     In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Synoptic to operate a physical therapy practice, the Management Defendants entered into a secret scheme with Contreras-Cancio. In exchange for a designated salary or other form of compensation from the Management Defendants, in early 2013 Contreras-Cancio agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the triennial statements filed

thereafter, that she was the true shareholder, director, and officer of Synoptic and that she truly owned, controlled, and practiced through the professional corporation. Contreras-Cancio did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

93.    Once Synoptic was fraudulently incorporated on May 3, 2013, Contreras-Cancio ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

94.    The Management Defendants – rather than Contreras-Cancio – provided all start-up costs and investment in Synoptic. Contreras-Cancio did not incur any costs to establish Synoptic's practice, nor did she invest any money in the professional corporation she purportedly owned.

95.    Thereafter, the Management Defendants caused Synoptic to commence operations on a transient basis from at least seventeen different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those Clinics in exchange for patient referrals to Synoptic.

96.    Contreras-Cancio never was the true shareholder, director, or officer of Synoptic, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Synoptic always rested entirely with the Management Defendants, who used the façade of Synoptic to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

97.    Contreras-Cancio exercised absolutely no control over or ownership interest in Synoptic. All decision-making authority relating to the operation and management of Synoptic was vested entirely with the Management Defendants.

98.    In addition, Contreras-Cancio never controlled or maintained any of Synoptic's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Synoptic's financial affairs; never

hired or supervised any of Synoptic's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Synoptic operated.

99.    In keeping with the fact that Contreras-Cancio exercised no genuine ownership interest in or control over Synoptic, she never actually practiced physical therapy through Synoptic.

### 7.    The Fraudulent Incorporation of Dunamis

100.    In mid-2013, the Management Defendants recruited Galdo, a licensed physical therapist who was willing to sell them the use of her physical therapy license so that they could fraudulently incorporate Dunamis.

101.    In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing Dunamis to operate a physical therapy practice, the Management Defendants entered into a secret scheme with Galdo. In exchange for a designated salary or other form of compensation from the Management Defendants, in mid-2013 Galdo agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the triennial statements filed thereafter, that she was the true shareholder, director, and officer of Dunamis and that she truly owned, controlled, and practiced through the professional corporation. Galdo did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

102.    Once Dunamis was fraudulently incorporated on October 11, 2013, Galdo ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

103.    The Management Defendants – rather than Galdo – provided all start-up costs and investment in Dunamis. Galdo did not incur any costs to establish Dunamis's practice, nor did she invest any money in the professional corporation she purportedly owned.

104.    Thereafter, the Management Defendants caused Dunamis to commence operations on a transient basis from at least eighteen different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those clinics in exchange for patient referrals to Dunamis.

105.    Galdo never was the true shareholder, director, or officer of Dunamis, and never had any true ownership interest in or control over the professional corporation. True ownership and control over Dunamis always rested entirely with the Management Defendants, who used the façade of Dunamis to do indirectly what they were forbidden from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

106.    Galdo exercised absolutely no control over or ownership interest in Dunamis. All decision-making authority relating to the operation and management of Dunamis was vested entirely with the Management Defendants.

107.    In addition, Galdo never controlled or maintained any of Dunamis's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Dunamis's financial affairs; never hired or supervised any of Dunamis's employees or independent contractors; and was completely unaware of the most fundamental aspects of how Dunamis operated.

108.    In keeping with the fact that Galdo exercised no genuine ownership interest in or control over Dunamis, she never actually practiced physical therapy through Dunamis.

**8.    The Fraudulent Incorporation of LLJ Therapeutic**

109.    In mid-2014, the Management Defendants recruited Rufino, a licensed physical therapist who was willing to sell them the use of her physical therapy license so that they could fraudulently incorporate LLJ Therapeutic.

110. In order to circumvent New York law and to induce the New York State Education Department (the "Education Department") to issue a certificate of authority authorizing LLJ Therapeutic to operate a physical therapy practice, the Management Defendants entered into a secret scheme with Rufino. In exchange for a designated salary or other form of compensation from the Management Defendants, in mid-2014 Rufino agreed to falsely represent in the certificate of incorporation filed with the Education Department, and the triennial statements filed thereafter, that she was the true shareholder, director, and officer of LLJ Therapeutic and that she truly owned, controlled, and practiced through the professional corporation. Rufino did this knowing that the professional corporation would be used to submit fraudulent billing to insurers.

111. Once LLJ Therapeutic was fraudulently incorporated on August 7, 2014, Rufino ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

112. The Management Defendants – rather than Rufino – provided all start-up costs and investment in LLJ Therapeutic. Rufino did not incur any costs to establish LLJ Therapeutic's practice, nor did she invest any money in the professional corporation she purportedly owned.

113. Thereafter, the Management Defendants caused LLJ Therapeutic to commence operations on a transient basis from at least twenty-six different multi-disciplinary no-fault clinics by paying kickbacks to the owners of those clinics in exchange for patient referrals to LLJ Therapeutic.

114. Rufino never was the true shareholder, director, or officer of LLJ Therapeutic, and never had any true ownership interest in or control over the professional corporation. True ownership and control over LLJ Therapeutic always rested entirely with the Management Defendants, who used the façade of LLJ Therapeutic to do indirectly what they were forbidden

from doing directly, namely: (i) employ medical professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

115.    Rufino exercised absolutely no control over or ownership interest in LLJ Therapeutic. All decision-making authority relating to the operation and management of LLJ Therapeutic was vested entirely with the Management Defendants.

116.    In addition, Rufino never controlled or maintained any of LLJ Therapeutic's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of LLJ Therapeutic's financial affairs; never hired or supervised any of LLJ Therapeutic's employees or independent contractors; and was completely unaware of the most fundamental aspects of how LLJ Therapeutic operated.

117.    In keeping with the fact that Rufino exercised no genuine ownership interest in or control over LLJ Therapeutic, she never actually practiced physical therapy through LLJ Therapeutic.

**B.     The Management Defendants' Efforts to Conceal their Ownership and Control of the Provider Defendants**

**1.     The Sham Management, Billing, Marketing, and/or Lease Agreements**

118.    To conceal their true ownership and control of the Provider Defendants while simultaneously effectuating pervasive, total control over their operation and management, the Management Defendants arranged to have the Nominal Owner Defendants and the Provider Defendants enter into a series of "management", "billing", "marketing", and/or "lease" agreements with themselves.  These agreements called for exorbitant payments from the Provider Defendants to the Management Defendants purportedly for the performance of certain designated services including management, marketing, billing, and/or collections, regardless of the actual value of the services or space provided.

119.   While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the Provider Defendants; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through the Provider Defendants.

120.   The net effect of these "management", "billing", "marketing", and "lease" agreements between the Nominal Owner Defendants, the Provider Defendants, and the Management Defendants was to maintain the Provider Defendants in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivables, and any revenues that might be generated therefrom.

## 2.   The Defendants' Use of P.O. Boxes and Private Mailboxes as Billing Addresses

121.   In keeping with the fact that the Management Defendants maintained total control over the professional corporations, their accounts receivables, and any revenues that might be generated therefrom, the Management Defendants arranged for the Nominal Owner Defendants to nominally rent United States Postal Service mailboxes or private mailboxes to be used as billing addresses for the Provider Defendants. The Management Defendants then caused the Provider Defendants to submit billing to GEICO which falsely represented that these mailboxes were legitimate places of business by, among other things, misrepresenting the pertinent mailbox number as a "suite" number.

122.   Once each mailbox was rented, the Nominal Owner Defendants transferred complete control and access to the mailbox over to the Management Defendants. The

Management Defendants would then make regular stops at the mailbox locations to pick up and deposit the checks issued to the Provider Defendants by GEICO and other insurers, and then siphon off the revenue generated by the Provider Defendants' fraudulent billing.

123.   In keeping with the fact that the Management Defendants, not the Nominal Owner Defendants, were the ones controlling and accessing the mailboxes on a regular basis, the mailboxes were all proximately located to the Management Defendants' primary residences in Brooklyn, and not in the Bronx, Queens, Staten Island, or New Jersey where six of the seven Nominal Owner Defendants resided.

### 3.   The Signature Stamps

124.   In keeping with the fact that the Management Defendants and not the Nominal Owner Defendants owned and controlled the Provider Defendants, the Management Defendants caused virtually every bill submitted to GEICO through the Provider Defendants to be either: (1) electronically signed with the pertinent Nominal Owner Defendant's signature; or (2) to be stamped with a custom signature stamp of the pertinent Nominal Owner Defendant's signature. The electronic or stamped signature was designed to falsely represent that the pertinent Nominal Owner Defendant played a role in the performance of the Fraudulent Services and actually reviewed the bill prior to its submission.

125.   In actuality, none of the Fraudulent Services were performed by the Nominal Owner Defendants, and none of the bills for the Fraudulent Services were reviewed or signed by the Nominal Owner Defendants. Rather, the Management Defendants caused virtually every bill submitted to GEICO through the Provider Defendants to be transmitted despite the fact that none of the Fraudulent Services were actually performed by the Nominal Owner Defendants, and none of the bills were reviewed or signed by the Nominal Owner Defendants.

**4.      The Periodic Changes in Corporate Name and Nominal Ownership**

126.    In order to avoid detection and to increase the amount of fraudulent billing they could submit to GEICO and other insurers, the Management Defendants never caused one Provider to "treat" Insureds for more than ten months. Consequently, from time-to-time, the Management Defendants would seek out a new licensed medical professional that was willing to sell them the use of his or her professional license so that the Management Defendants could either: (i) illegally operate and control a medical professional corporation or general business corporation previously incorporated by the medical professional; or (ii) fraudulently incorporate a new medical professional corporation under the medical professional's name, and thereby perpetuate their fraudulent scheme.

127.    The Management Defendants would then cause the newly acquired or newly incorporated corporation to submit billing to GEICO using the same fraudulent testing and billing protocol used by the previous corporation. Notwithstanding the repeated changes in corporate name and nominal ownership, the Provider Defendants – under the direction and control of the Management Defendants – all billed for the same services under the same CPT codes, used the same forms, and operated out of many of the same Clinics. The Provider Defendants also provided virtually every Insured with the same exact diagnosis.

128.    Specifically, on or about January 3, 2011, the Management Defendants arranged for ROM Medical, nominally owned by Zarhin, to begin seeing Insureds at several multi-disciplinary clinics throughout New York. ROM Medical purported to provide Insureds with computerized range of motion testing, computerized muscle testing, and ALM testing. In or about June 2011, the Management Defendants caused ROM Medical to stop seeing Insureds and arranged for Rehabxpress, nominally owned by Natividad, and Rehab Choice Corp., nominally owned by Hontiveros, to begin seeing Insureds at many of the same Clinics. Rehabxpress and

Rehab Choice Corp. purported to provide Insureds with the very same computerized range of motion testing, computerized muscle testing, and ALM testing. The CPT codes used by Rehabxpress and Rehab Choice Corp. were the same ones used by ROM Medical. The computer-generated forms used by Rehabxpress and Rehab Choice Corp. were the same ones used by ROM Medical.

129. In or about March 2012, the Management Defendants caused both Rehabxpress and Rehab Choice Corp. to stop seeing Insureds. The shutdown of Rehabxpress and Rehab Choice Corp. coincided with the unsealing of the Zemlyansky Indictment, which charged Mikhalov and others with multiple crimes, including RICO Conspiracy, Conspiracy to Commit Health Care Fraud, Conspiracy to Commit Mail Fraud and Conspiracy to Commit Money Laundering, committed in connection with a massive scheme to defraud New York automobile insurance companies of more than $279 million under New York's no-fault insurance laws. Also charged in the Zemlyansky Indictment was an individual named Andrey Anikeyev ("Anikeyev"). The Zemlyansky Indictment averred that Mikhalov, Anikeyev and others participated in a vast RICO criminal enterprise whereby non-professionals controlled medical practices (akin to the allegations in this case) by paying licensed medical practitioners to use their licenses to incorporate the professional corporations. See United States v. Zemlyansky, supra.

130. As discussed above, Mikhalov pled guilty to one count of conspiracy to commit health care fraud in March 2013. See United States of America v. Zemlyansky, 12-CR-00171 (S.D.N.Y. 2012) (JPO). Similarly, in March 2013, Anikeyev pled guilty to one count of conspiracy to commit health care fraud and mail fraud. See id.

131. Upon information and belief, Defendant Seifer and Anikeyev are close relatives and/or business associates. Specifically, Seifer and Anikeyev are co-owners of a residential property in Cape Coral, Florida.

132.   Upon information and belief, as a result of charges leveled against Mikhalov and Anikeyev by the Government, for a period of roughly six months subsequent to the unsealing of the Zemlyansky Indictment, the Management Defendants chose to put their fraudulent scheme on hold in order to avoid detection by the authorities.

133.   Nevertheless, on or about September 6, 2012 the Management Defendants decided to continue their fraudulent scheme. Specifically, the Management Defendants caused NR Motion, nominally owned by Roque, to begin seeing Insureds at many of the same Clinics previously utilized by ROM Medical, Rehabxpress, and Rehab Choice Corp. NR Motion purported to provide Insureds with the very same computerized range of motion testing and ALM testing purportedly provided by ROM Medical, Rehabxpress, and Rehab Choice Corp., as well as manual muscle testing. The CPT codes used by NR Motion were the same ones used by ROM Medical, Rehabxpress, and Rehab Choice Corp. The computer-generated forms used by NR Motion were the same ones used by ROM Medical, Rehabxpress, and Rehab Choice Corp.

134.   In or about June 2013, the Management Defendants caused NR Motion to stop seeing Insureds, and arranged for Synoptic, nominally owned by Contreras-Cancio, to begin seeing Insureds at many of the same Clinics previously utilized by ROM Medical, Rehabxpress, Rehab Choice Corp., and NR Motion. Synoptic purported to provide Insureds with the very same computerized range of motion testing, manual muscle testing, and ALM testing provided by NR Motion. The CPT codes used by Synoptic were the same ones used by ROM Medical, Rehabxpress, Rehab Choice Corp., and NR Motion. The computer-generated forms used by Synoptic were the same ones used by ROM Medical, Rehabxpress, Rehab Choice Corp., and NR Motion.

135.   In or about January 2014, Synoptic stopped seeing Insureds, and Dunamis, nominally owned by Galdo, began seeing Insureds at many of the same Clinics previously

33

utilized by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, and Synoptic. Dunamis purported to provide Insureds with the very same computerized range of motion testing, manual muscle testing, and ALM testing provided by NR Motion and Synoptic. The CPT codes used by Dunamis were the same ones used by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion and Synoptic. The computer-generated forms used by Dunamis were the same forms used by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, and Synoptic.

136.   In or about August 2014, the Management Defendants caused Dunamis to stop seeing Insureds, and arranged for LLJ Therapeutic, nominally owned by Rufino, to begin seeing Insureds at many of the same Clinics previously utilized by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, Synoptic, and Dunamis. LLJ Therapeutic purported to provide Insureds with the very same computerized range of motion testing, manual muscle testing, and ALM testing provided by NR Motion, Synoptic, and Dunamis. The CPT codes used by LLJ Therapeutic were the same ones used by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, Synoptic, and Dunamis. The computer-generated forms used by LLJ Therapeutic were the same forms used by ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, Synoptic, and Dunamis.

137.   The Management Defendants' unlawful ownership and control of the Provider Defendants – as evidenced by the sham agreements between the Provider Defendants and the Management Defendants, the use of Brooklyn-based mailboxes as billing addresses, the use of signature stamps, and the frequent changes in corporate name and nominal ownership – compromised patient care, because the provision of health services through the Provider Defendants was entirely subject to the pecuniary interests of its non-medical layperson owners, not the independent medical judgment of true medical professional-owners.

## C.  The Multidisciplinary Clinics and Kickbacks

138.  The Provider Defendants did not advertise or market their services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

139.  Instead, the Provider Defendants operated from a series of multidisciplinary clinics, i.e., the Clinics, including, but not limited to, the following locations:

(i)        102-06 Metropolitan Ave, Forest Hills, NY

(ii)       2025 Davidson Ave, Bronx, NY

(iii)      2098 Rockaway Pkwy, Brooklyn, NY

(iv)      2363 Ralph Ave, Brooklyn, NY

(v)       4738 Broadway, New York, NY

(vi)      29 Broadway, 2nd Fl, Lynbrook, NY

(vii)     5912 Flatlands Ave, Brooklyn, NY

(viii)    1552 Ralph Ave, Brooklyn, NY

(ix)      210 E Sunrise Hwy, Ste 101, Valley Stream, NY

(x)       2386 Jerome Ave, Bronx, NY

(xi)      2426 Eastchester Rd, #212, Bronx, NY

(xii)     369 E 148th St, Bronx, NY

(xiii)    535 Utica Ave, Brooklyn, NY

(xiv)    632 Utica Ave, Brooklyn, NY

(xv)     764 Elmont Rd, Elmont, NY

(xvi)    63-70 Woodhaven Blvd, Flushing, NY

(xvii)   1220 East New York Ave, Brooklyn, NY

(xviii)  100-05 Roosevelt Ave, Corona, NY

(xix)      265 Ave X, Brooklyn, NY

(xx)      109-17 46th Ave, Corona, NY

(xxi)      1310 Pugsley Ave, Bronx, NY

(xxii)      1491 Broadway, Brooklyn, NY

(xxiii)      172-17 Jamaica Ave, Jamaica, NY

(xxiv)      205-07 Hillside Ave, Hollis, NY

(xxv)      2261 Church Ave, Brooklyn, NY

(xxvi)      3108 3rd Ave, Bronx, NY

(xxvii)      615 Seneca Ave, Ridgewood, NY

(xxviii)      64 Nagle Ave, New York, NY

(xxix)      90-46 Corona Ave, Elmhurst, NY

(xxx)      910 E Gun Hill Rd, Bronx, NY

(xxxi)      150-11 Hillside Ave, Jamaica, NY

(xxxii)      3305 3rd Ave, Bronx, NY

(xxxiii)      5504-5506 Avenue N, Brooklyn, NY

(xxxiv)      799 Morris Park Ave, Bronx, NY

(xxxv)      175-61 Hillside Ave, Jamaica, NY

(xxxvi)      1760 A Eastern Pkwy, Brooklyn, NY

(xxxvii)      1783 Bedford Ave, Brooklyn, NY

(xxxviii)      2034 Atlantic Ave, Brooklyn, NY

(xxxix)      2583 Ocean Ave, Brooklyn, NY

(xl)      2955 Webster Ave, Bronx, NY

(xli)      3763 83rd St, Jackson Heights, NY

(xlii)      3858 Nostrand Ave, Brooklyn, NY

(xliii)    597-599 Southern Blvd, Bronx, NY

(xliv)    630 Flatbush Ave, Brooklyn, NY

(xlv)     932 E 174th St, Bronx, NY

(xlvi)    3763 83rd St, Bronx, NY

140.    The owners and controllers of the Clinics arranged for Insureds who presented to the Clinics to be referred to the Provider Defendants in exchange for kickbacks from the Management Defendants.

141.    The kickbacks that the Management Defendants provided to the Clinic owners and controllers were disguised as ostensibly legitimate fees to "rent" space or personnel from the Clinics. In actuality, these were "pay-to-play" arrangements that caused the Clinics to steer Insureds to the Provider Defendants, with the amount of the fees based upon the volume of Insureds that were expected to be referred to the Provider Defendants for "testing".

142.    In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the Provider Defendants for the bogus testing, regardless of individual symptoms or presentment by the patient.

143.    The referrals typically were made by a receptionist or some other non-medical personnel at the Clinics who simply directed or "steered" the Insureds to whichever Provider Defendant was active during that time period and present at that particular Clinic on that day.

**D.    The Defendants' Predetermined Testing and Billing Protocol**

144.    Virtually all of the Insureds who were referred to the Provider Defendants were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

145.    Even so, the Defendants purported to subject virtually every Insured to a course of "testing" that was provided pursuant to a pre-determined, fraudulent protocol designed to

maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

**1.    The Bogus Computerized Range of Motion Tests, Computerized Muscle Tests, and Manual Muscle Tests**

146.    Upon delivery of an Insured from the owners and controllers of the Clinics, the Defendants purported to subject virtually every Insured to range of motion testing and computerized or manual muscle testing as dictated by the Management Defendants.

147.    The charges for the computerized range of motion tests and muscle tests were fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the kickbacks that the Management Defendants paid to the Clinic owners and controllers.

148.    The charges for the computerized range of motion tests and muscle tests were also fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the dictates of unlicensed laypersons, rather than licensed healthcare professionals.

149.    In keeping with the fact that Defendants' fraudulent testing protocol was dictated by unlicensed laypersons, the computerized range of motion and muscle testing was typically performed on or near initial or follow-up examinations performed by other providers at the Clinics which included range of motion and muscle tests.

150.    Despite the fact that every Insured already received manual range of motion and manual muscle testing during their initial examinations and follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already was paid by GEICO as a component of reimbursement for the initial examinations and follow-up examinations, the Defendants systemically billed for, and purported to perform, a series of computerized range of motion tests and computerized or manual muscle tests on most Insureds.

151.   Under the circumstances employed by the Defendants, the range of motion and muscle tests represented purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during virtually every Insured's initial examination and follow-up examinations.

152.   The Defendants also unbundled the charges for the range of motion tests and muscle tests.

153.   Under the Fee Schedule, if range of motion and muscle testing are performed on the same date, all the testing should be reported and billed using CPT code 97750.

154.   CPT code 97750 is a "time-based" code that – in the New York metropolitan area – allows for a single charge of $45.71 for every 15 minutes of testing that is performed. For example, if a provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $45.71. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $45.71, resulting in total charges of $91.42, and so on.

155.   To the extent the Defendants actually provided the range of motion tests and muscle tests to Insureds at all, the tests virtually always were provided on the same dates of service and never took more than 15 minutes to perform. Thus, even if the range of motion tests and muscle tests that the Defendants purported to perform were medically necessary and performed in the first instance, the Defendants would be limited to a single, time-based charge of $45.71 under CPT code 97750 for each date of service on which they performed computerized range of motion tests and manual muscle tests on an Insured.

156.   In order to maximize their fraudulent billing for the range of motion and muscle tests, however, the Defendants unbundled what should have been – at most – a single charge of $45.71 under CPT code 97750 for both computerized range of motion and manual muscle testing

into multiple charges under CPT codes 95831 - 95834 for the muscle tests, and multiple charges under CPT code 95851 for the range of motion tests.

157.   In so doing, the Defendants generally submitted charges inflated by several hundreds of dollars per round of range of motion and muscle testing they purported to provide, thereby exponentially increasing the billing submitted to GEICO and other insurers.

158.   In keeping with the fact that the Provider Defendants all operated under the common ownership and control of the Management Defendants, the Providers Defendants all used the exact same computer-generated forms for the computerized range of motion tests and computerized muscle tests, as well as the same template form for the manual muscle tests.

**2.     The Bogus Activity Limitation Measurement Tests**

159.   In an effort to maximize the amount of fraudulent billing they could submit to GEICO and other insurers, the Defendants purported to subject virtually every Insured to multiple, duplicative activity limitation measurement ("ALM") tests.

160.   The charges for the ALM tests were fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the kickbacks that the Management Defendants paid to the Clinic owners and controllers.

161.   The charges for the ALM tests were also fraudulent in that the tests were performed – to the extent they were performed at all – pursuant to the dictates of unlicensed laypersons, rather than licensed healthcare professionals.

162.   The Defendants typically billed the ALM tests to GEICO under CPT code 97799, generally resulting in charges of at least $475.00, for each date of service on which the test was supposedly were performed.

163.   The Defendants purported to provide ALM tests to virtually every Insured despite their actual knowledge that the ALM tests, to the extent that they were performed at all, were

duplicative of both: (1) the manual muscle testing that was part and parcel of the initial examination and follow-up examinations performed by other health care providers at the Clinics; and (2) the muscle testing the Defendants themselves purported to provide to virtually every Insured and then billed to GEICO under CPT codes 95831 - 95834.

164.    In keeping with the fact that the Provider Defendants all operated under the common ownership and control of the Management Defendants, the Providers Defendants all used the exact same form for the ALM testing, with verbatim descriptions of the individual tests purportedly performed. All of the Providers Defendants also submitted a verbatim two-page explanation of activity limitation measurement which purported to describe the purpose and necessity for such testing.

165.    Specifically, virtually every bill for ALM testing submitted to GEICO contained the following verbatim statements, including the same idiosyncratic grammar:

(i)     "Purpose of the Activity Limitation Test is to accurately determine individual's ability to perform meaningful tasks safely and dependably. It is based on objective performance measurements that are analyzed and recorded by state-of-the-art computer technology. It is not an observation or subjective determination of an individual's self report of abilities."

(ii)    "Results of the test will serve three valuable purposes. First, it will identify functional weakness and strength deficits, allowing for proper treatment and rehabilitation. Secondly, it aids in establishing an impartial and objective measurement of the patient's capabilities, daily activities and work limitations, necessary for both judicial resolution and/or disability determination. Third, it provides the patient with objective and quantifiable limitations he/she faces as a result of the injury. Establishing safe activity limits and training are aimed at determination of limitation and outlining the precautions to be taken not to aggravate the injury."

(iii)   "The patient was tested using JTech computerized static lift strength evaluation system. Coefficient of Variation and difference between successive reps of 14% or less indicates validity, reproducibility, and consistency of effort. Series of six tests were performed and all met the validity criteria."

(iv)    "Depending on the level of patient's compliance, the examination may take between 20-50 minutes. In addition to the testing, patient received a

comprehensive training as to how to deal with the limitations in both work and home environment. Patient received written and verbal instructions as to how to avoid aggravating the injury and what steps need to be taken outside of formal medical setting in order to facilitate recovery."

### 3.   The Bogus Verbatim Diagnoses

166.   In keeping with the fact that the Provider Defendants were all operated under the common ownership and control of the Management Defendants and that the Defendants' fraudulent testing protocol was dictated by unlicensed laypersons, virtually every Insured was reported by Defendants to have the same verbatim diagnosis.

167.   Specifically, the Provider Defendants implausibly purported to diagnosis virtually every Insured with "Traumatic Lumbar paraspinal myofascitis with S1 discogenic radiculopathy and ext."

168.   In actuality, the Provider Defendants virtually never provided any legitimate treatment or testing to any Insured. Rather, after purporting to provide the range of motion testing, muscle testing, and ALM testing, the Defendants simply prepared ersatz medical reports and billing which falsely contended that the Insureds suffered from "Traumatic Lumbar paraspinal myofascitis with S1 discogenic radiculopathy and ext."

### E.   The Fraudulent Billing for Services Provided by Unlicensed Technicians

169.   Not only were the Defendants' charges for the Fraudulent Services fraudulent in that they were unbundled, inflated, and billed pursuant to a predetermined testing and billing protocol dictated by laypersons, the charges also misrepresented the identity of the individuals who actually performed the tests.

170.   Pursuant to the Fee Schedule, when the Defendants submitted charges to GEICO for computerized range of motion testing, manual muscle testing, and ALM testing, they represented that the underlying service was performed by a physician, physical therapist, or other

licensed healthcare provider. Specifically, in every bill the Defendants represented that the Fraudulent Services were performed by one of the Nominal Owner Defendants through one of the Provider Defendants.

171.   However, to the extent that the Fraudulent Services were provided in the first instance, they were performed by unlicensed technicians, rather than any licensed healthcare provider.

172.   Pursuant to the Fee Schedule, when a healthcare provider submits a charge under CPT code 95831-95834, 95851, or 97799, the provider represents that it has prepared a written report interpreting the data obtained from the test.

173.   In keeping with the fact that the Fraudulent Services were provided – to the extent that they were provided at all – by unlicensed technicians rather than licensed healthcare providers, the test reports generated by Defendants all consisted solely of raw data and pre-printed boilerplate language, and contained no interpretation of the data by any of the Nominal Owner Defendants, or any other licensed healthcare provider.

174.   In keeping with the fact that the Fraudulent Services were provided by unlicensed technicians rather than licensed healthcare providers (or often not provided at all), the billing submitted to GEICO implausibly indicated that an individual Nominal Owner Defendant routinely performed testing at up to seven different Clinics in four different New York counties, all in a single day. For example:

    (i)    On September 3, 2014, Rufino purported to perform testing through LLJ Therapeutic at six different Clinics in four different counties including clinics at the following locations: (1) 1220 East New York Ave, Brooklyn, NY; (2) 2386 Jerome Ave, Bronx, NY; (3) 63-70 Woodhaven Blvd, Rego Park, NY; (4) 1552 Ralph Avenue, Brooklyn, NY; (5) 172-17 Jamaica Ave, Jamaica, NY; and (6) 210 E Sunrise Hwy, Valley Stream, NY.

    (ii)    On September 4, 2014, Rufino purported to perform testing through LLJ Therapeutic at seven different Clinics in two different counties including

clinics at the following locations: (1) 1552 Ralph Ave, Brooklyn, NY; (2) 205-07 Hillside Ave, Hollis, NY; (3) 2098 Rockaway Pkwy, Brooklyn, NY; (4) 2261 Church Ave, Brooklyn, NY; (5) 369 East 148th St, Bronx, NY; (6) 535 Utica Ave, Brooklyn, NY; and (7) 90-46 Corona Ave, Elmhurst, NY.

(iii)   On September 11, 2014, Rufino purported to perform testing through LLJ Therapeutic at six different Clinics in two different counties including clinics at the following locations: (1) 1220 East New York Avenue, Brooklyn, NY; (2) 1552 Ralph Ave, Brooklyn, NY; (3) 2098 Rockaway Pkwy, Brooklyn, NY; (4) 2363 Ralph Ave, Brooklyn, NY; (5) 369 E 148th St, Bronx, NY; and (6) 535 Utica Ave, Brooklyn, NY.

(iv)   On October 15, 2014, Rufino purported to perform testing through LLJ Therapeutic at six different Clinics in three different counties including clinics at the following locations: (1) 1220 E New York Ave, Brooklyn, NY; (2) 1552 Ralph Ave, Brooklyn, NY; (3) 172-17 Jamaica Ave, Jamaica, NY; (4) 2261 Church Ave, Brooklyn, NY; (5) 2386 Jerome Ave, Bronx, NY; and (6) 5912 Flatlands Ave, Brooklyn, NY.

(v)   On January 23, 2014, Galdo purported to perform testing through Dunamis at six different Clinics in four different counties including clinics at the following locations: (1) 102-06 Metropolitan Ave, Forest Hills, NY; (2) 1552 Ralph Ave, Brooklyn, NY; (3) 210 E Sunrise Hwy, Valley Stream, NY; (4) 2363 Ralph Ave, Brooklyn, NY; (5) 2386 Jerome Ave, Bronx, NY; and (6) 535 Utica Ave, Brooklyn, NY.

(vi)   On January 31, 2014, Galdo purported to perform testing through Dunamis at seven different Clinics in four different counties including clinics at the following locations: (1) 1220 East New York Ave, Brooklyn, NY; (2) 1552 Ralph Ave, Brooklyn, NY; (3) 2098 Rockaway Pkwy, Brooklyn, NY; (4) 210 E Sunrise Hwy, Valley Stream, NY; (5) 2386 Jerome Ave, Bronx, NY; (6) 535 Utica Ave, Brooklyn, NY; and (7) 76 Elmont Rd, Elmont, NY.

(vii)   On February 6, 2014, Galdo purported to perform testing through Dunamis at seven different Clinics in three different counties including clinics at the following locations: (1) 102-06 Metropolitan Ave, Forest Hills, NY; (2) 2025 Davidson Ave, Bronx, NY; (3) 2363 Ralph Ave, Brooklyn, NY; (4) 2386 Jerome Ave, Bronx, NY; (5) 535 Utica Ave, Brooklyn, NY; (6) 5912 Flatlands Ave, Brooklyn, NY; and (7) 632 Utica Ave, Brooklyn, NY.

(viii)   On February 7, 2014, Galdo purported to perform testing through Dunamis at seven different Clinics in four different counties including clinics at the following locations: (1) 2025 Davidson Ave, Bronx, NY; (2) 210 E Sunrise Hwy, Valley Stream, NY; (3) 2386 Jerome Ave, Bronx, NY; (4) 2426 Eastchester Rd, Bronx, NY; (5) 369 E 148th St, Bronx, NY; (6) 4738 Broadway, New York, NY; and (7) 535 Utica Ave, Brooklyn, NY.

(ix)     On July 3, 2013, Contreras-Cancio purported to perform testing through Synoptic at six different Clinics in three different counties including clinics at the following locations: (1) 1552 Ralph Ave, Brooklyn, NY; (2) 2025 Davidson Ave, Bronx, NY; (3) 2426 Eastchester Rd, Bronx, NY; (4) 535 Utica Ave, Brooklyn, NY; (5) 5912 Flatlands Ave, Brooklyn, NY; and (6) 764 Elmont Rd, Elmont, NY.

(x)      On July 16, 2013, Contreras-Cancio purported to perform testing through Synoptic at seven different Clinics in four different counties including clinics at the following locations: (1) 102-06 Metropolitan Ave, Forest Hills, NY; (2) 2426 Eastchester Rd, Bronx, NY; (3) 4738 Broadway, New York, NY; (4) 1552 Ralph Ave, Brooklyn, NY; (5) 2025 Davidson Ave, Bronx, NY; (6) 5912 Flatlands Ave, Brooklyn, NY; and (7) 764 Elmont Rd, Elmont, NY.

(xi)     On December 4, 2014, Contreras-Cancio purported to perform testing through Synoptic at seven different Clinics in three different counties including clinics at the following locations: (1) 1552 Ralph Ave, Brooklyn, NY; (2) 2025 Davidson Ave, Bronx, NY; (3) 2363 Ralph Ave, Brooklyn, NY; (4) 2426 Eastchester Rd, Bronx, NY; (5) 5912 Flatlands Ave, Brooklyn, NY; (6) 632 Utica Ave, Brooklyn, NY; and (7) 764 Elmont Rd, Elmont, NY.

(xii)    On December 6, 2013, Contreras-Cancio purported to perform testing through Synoptic at five different Clinics in two different counties including clinics at the following locations: (1) 2363 Ralph Ave, Brooklyn, NY; (2) 2386 Jerome Ave, Bronx, NY; (3) 443 Winthrop St, Brooklyn, NY; (4) 535 Utica Ave, Brooklyn, NY; (5) 5912 Flatlands Ave, Brooklyn, NY.

175.    Furthermore, numerous Insureds interviewed by GEICO indicated that the testing was done by Russian males, despite the fact that five of the seven Nominal Owner Defendants identified as female at the time they purported to provide the Fraudulent Services, and, upon information and belief, none of the Nominal Owner Defendants are of Russian or Eastern European descent.

**F.    The Fraudulent Charges for Services Provided by Professional Corporations Whose Nominal Owners Failed to Practice through the Corporation**

176.    The billing submitted to GEICO for services allegedly provided through the Provider Defendants was fraudulent for the additional reason that it misrepresented that the Provider Defendants were lawfully licensed and eligible to bill for and to collect No-Fault Benefits, when in fact the Provider Defendants were not eligible to bill for or to collect No-Fault

Benefits because they were owned on paper by medical professionals who did not actually practice through their respective professional corporations.

177.  New York Business Corporation Law §1507 makes clear that a medical professional shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. In particular, Section 1507 provides, in pertinent part, as follows:

Issuance of shares

A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued … . All shares issued, agreements made, or proxies granted in violation of this section shall be void.

178.  Legislative history confirms that the physical therapist-owner of a physical therapist professional corporation not only must be licensed to practice physical therapy but must also be engaged in the practice of physical therapy in the professional corporation. Similarly, a physician-owner of a medical professional corporation not only must be licensed to practice medicine but must also be engaged in the practice of medicine in the professional corporation. For example, in commenting on the proposed amendment to Section 1507 in 1971, the New York State Education Department stated:

This bill amends the Business Corporation Law in relation to the operation of professional service corporations.  While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

179.  Similarly, the New York Department of State commented that:

Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is

46

authorized to practice <u>and who so practice in such corporation or a predecessor entity</u>.

The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

180.    New York's Department of Health was of the same opinion, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations <u>to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged</u>…. (Emphasis added.)

181.    Although the Defendants routinely submitted billing to GEICO for range of motion tests, muscle tests, and ALM tests which misrepresented that one of the licensed Nominal Owner Defendants performed the underlying test, in actuality the Nominal Owner Defendants never performed any of the tests or even practiced physical therapy or medicine through the Provider Defendants at all.

**G.    The Fraudulent Billing for Services Provided by Independent Contractors**

182.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

183.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See <u>DOI Opinion Letter</u>, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of

those services"); <u>DOI Opinion Letter</u>, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); <u>DOI Opinion Letter</u>, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); <u>DOI Opinion Letter</u>, October 29, 2003 (extending the independent contractor rule to hospitals); <u>See</u> <u>DOI Opinion Letter</u>, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "19").

184. Zarhin is the only healthcare provider even purportedly employed by ROM Medical.

185. Natividad is the only healthcare provider even purportedly employed by Rehabxpress.

186. Hontiveros is the only healthcare provider even purportedly employed by Rehab Choice Corp.

187. Roque is the only healthcare provider even purportedly employed by NR Motion.

188. Contreras-Cancio is the only healthcare provider even purportedly employed by Synoptic.

189. Galdo is the only healthcare provider even purportedly employed by Dunamis.

190. Rufino is the only healthcare provider even purportedly employed by LLJ Therapeutic.

191.    Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the Provider Defendants for Fraudulent Services performed by individuals other than Zarhin, Natividad, Hontiveros, Roque, Conteras-Cancio, Galdo, and Rufino.

192.    To the extent they were performed in the first instance, all of the Fraudulent Services performed by persons other than Zarhin, Natividad, Hontiveros, Roque, Conteras-Cancio, Galdo, and Rufino, were performed by unlicensed technicians whom the Defendants treated as independent contractors.

193.    For instance, the Defendants:

(i)     paid the unlicensed technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the unlicensed technicians that they were independent contractors, rather than employees;

(iii)   paid no employee benefits to the unlicensed technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the unlicensed technicians;

(v)     failed to withhold federal, state or city taxes on behalf of the unlicensed technicians;

(vii)   permitted the unlicensed technicians to set their own schedules and days on which they desired to perform services;

(viii)  permitted the unlicensed technicians to maintain non-exclusive relationships and perform services on behalf of other medical practices;

(ix)    failed to cover the unlicensed technicians for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the unlicensed technicians were independent contractors.

194.    By electing to treat the unlicensed technicians as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the unlicensed technicians.

195.    Because the unlicensed technicians were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

196.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**H.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

197.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and testing reports through the Provider Defendant to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

198.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)      The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to

50

Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Provider Defendants were not properly licensed in that they were medical professional corporations that were fraudulently incorporated and/or unlawfully owned and controlled by, and split fees with, the Management Defendants, who are not licensed medical professionals.

(ii)    In cases involving Rehab Choice, the NF-3 forms, HCFA-1500 forms, and treatment reports misrepresented to GEICO that this Provider Defendant was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12) when, in fact, this Provider Defendant was not licensed to render professional medical services in New York.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were directed by providers lawfully owned by licensed professionals. In fact, the Fraudulent Services were not directed by licensed professionals. To the extent the Fraudulent services were performed, they were performed pursuant to pre-determined protocols dictated by laypersons.

(iv)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(v)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees.

(vi)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted uniformly misrepresented to GEICO that the Provider Defendants were owned by licensed professionals who practiced through the professional corporations.  In fact, they did not and the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits.

### III.    **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

199.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

200.    To induce GEICO to promptly pay the fraudulent charges for the healthcare services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

201.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that they were fraudulently incorporated, illegally operating, and unlawfully splitting fees with unlicensed persons.

202.    Further, the Defendants knowingly misrepresented and concealed facts to prevent discovery that the Nominal Owner Defendants did not actually practice through their respective professional corporations.

203.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that healthcare services were performed pursuant to pre-determined protocols dictated by unlicensed laypersons, designed to maximize the charges that could be submitted.

204.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed technicians associated with the Provider Defendants in order to prevent GEICO from discovering that the individuals performing many of the healthcare services – to the extent they were performed at all – were not employed by the Provider Defendants.  In virtually every case, the Defendants actually misrepresented the identity of the individual who purportedly performed the healthcare services, in order to conceal the fact that the services were performed by unlicensed technicians who were treated by the Provider Defendants as independent contractors.

205.     What is more, the Defendants billed for the healthcare services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

206.     Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that some of the Provider Defendants, including Synoptic and Dunamis, submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.  Nevertheless, in an attempt to conceal their fraud, these Provider Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

207.     GEICO maintains standard office practices and procedures that are designed to and do ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

208.     In accordance with the No-Fault Laws, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

209.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

210.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $2,740,000.00 based upon the fraudulent charges.

211.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

212.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

213.    There is an actual case in controversy between GEICO and the Defendants regarding more than $3,000,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO under the names of the Provider Defendants.

214.    The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants were fraudulently incorporated, and/or secretly and unlawfully owned and controlled by unlicensed individuals and entities.

215.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the name of Rehab Choice Corp. since it was never licensed to render professional medical services in New York.

216.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits.

217.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because, in many cases, the Fraudulent Services – to the extent they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

218.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the Provider Defendants were not eligible to bill for or to collect No-Fault Benefits as they were owned on paper by the Nominal Owner Defendants who did not actually practice through their respective professional corporations.

219.   The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services billed under the names of the Provider Defendants were provided – to the extent they were provided at all – pursuant to pre-determined protocols dictated by unlicensed laypersons in order to maximize profits and enrich themselves.

220.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because, in many cases, the Fraudulent Services never were provided in the first instance.

221.   The Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of the Provider Defendants because the billing codes used for the

Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

222.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Zarhin and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

223.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

224.    ROM Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

225.    Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of ROM Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that ROM Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a

professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1" and the sample medical bills annexed hereto as Exhibit "2".

226.    ROM Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated ROM Medical, inasmuch as ROM Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for ROM Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through ROM Medical to the present day.

227.    ROM Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. ROM Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by ROM Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

228.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $233,382.35 pursuant to the fraudulent bills submitted by the Defendants through ROM Medical.

229.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Zarhin and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

230.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

231.    ROM Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

232.    Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the ROM Medical enterprise.

233.    Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the ROM Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that ROM Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to

the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1" and the sample medical bills annexed hereto as Exhibit "2".

234.    Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

235.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $233,382.35 pursuant to the fraudulent bills submitted by the Defendants through ROM Medical.

236.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against ROM Medical, Zarhin, and the Management Defendants
### (Common Law Fraud)

237.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

238.    ROM Medical, Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and

concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

239.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that ROM Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully owned and controlled by non-medical professionals; (ii) in every claim, the representation that ROM Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that ROM Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it; (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by ROM Medical's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

240.   ROM Medical, Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ROM Medical that were not compensable under the No-Fault Laws.

241.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $233,382.35 pursuant to the fraudulent bills submitted by the Defendants through ROM Medical.

242.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

243.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against ROM Medical, Zarhin, and the Management Defendants**
**(Unjust Enrichment)**

244.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

245.     As set forth above, ROM Medical, Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

246.     When GEICO paid the bills and charges submitted by or on behalf of ROM Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

247.     ROM Medical, Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

248.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

249.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $233,382.35.

## SIXTH CAUSE OF ACTION
### Against Natividad and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

250.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

251.    Rehabxpress is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

252.    Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Rehabxpress's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Rehabxpress was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding

mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3" and the sample medical bills annexed hereto as Exhibit "4".

253.    Rehabxpress's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated Rehabxpress, inasmuch as Rehabxpress never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Rehabxpress to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Rehabxpress to the present day.

254.    Rehabxpress is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. Rehabxpress likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Rehabxpress in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

255.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $225,011.52 pursuant to the fraudulent bills submitted by the Defendants through Rehabxpress.

256.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Natividad and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

257.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

258.    Rehabxpress is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

259.    Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the Rehabxpress enterprise.

260.    Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Rehabxpress enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Rehabxpress was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative

sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3" and the sample medical bills annexed hereto as Exhibit "4".

261.    Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

262.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $225,011.52 pursuant to the fraudulent bills submitted by the Defendants through Rehabxpress.

263.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Rehabxpress, Natividad, and the Management Defendants
### (Common Law Fraud)

264.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

265.    Rehabxpress, Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

266.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Rehabxpress was properly licensed,

and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully owned and controlled by non-medical professionals; (ii) in every claim, the representation that Rehabxpress was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that Rehabxpress was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it; (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by Rehabxpress's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

267. Rehabxpress, Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rehabxpress that were not compensable under the No-Fault Laws.

268. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $225,011.52 pursuant to the fraudulent bills submitted by the Defendants through Rehabxpress.

66

269.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

270.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
**Against Rehabxpress, Natividad, and the Management Defendants**
**(Unjust Enrichment)**

271.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

272.     As set forth above, Rehabxpress, Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

273.     When GEICO paid the bills and charges submitted by or on behalf of Rehabxpress for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

274.     Rehabxpress, Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

275.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

276.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $225,011.52.

## TENTH CAUSE OF ACTION
### Against Hontiveros and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

277. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

278. Rehab Choice Corp. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

279. Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Rehab Choice Corp.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Rehab Choice Corp. was not eligible to receive under the No-Fault Laws because: (i) it was not licensed to render professional medical services in New York; (ii) it was unlawfully owned and controlled by non-medical professionals; (iii) it engaged in fee-splitting with non-medical professionals; (iv) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (v) the billed-for-services, in many cases, were not performed at all; (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vii) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5" and the sample medical bills annexed hereto as Exhibit "6".

280.     Rehab Choice Corp.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated Rehab Choice Corp., inasmuch as Rehab Choice Corp. never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Rehab Choice Corp. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Rehab Choice Corp. to the present day.

281.     Rehab Choice Corp. is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. Rehab Choice Corp. likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Rehab Choice Corp. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

282.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,278.77 pursuant to the fraudulent bills submitted by the Defendants through Rehab Choice Corp.

283.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Hontiveros and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

284.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

285.    Rehab Choice Corp. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

286.    Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the Rehab Choice Corp. enterprise.

287.    Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Rehab Choice Corp. enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Rehab Choice Corp. was not eligible to receive under the No-Fault Laws because: (i) it was not licensed to render professional medical services in New York; (ii) it was unlawfully owned and controlled by non-medical professionals; (iii) it engaged in fee-splitting with non-medical professionals; (iv) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (v) the billed-for-services, in many cases, were not performed at all; (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vii) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical

professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5" and the sample medical bills annexed hereto as Exhibit "6".

288.    Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

289.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,278.77 pursuant to the fraudulent bills submitted by the Defendants through Rehab Choice Corp.

290.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Rehab Choice Corp., Hontiveros, and the Management Defendants**
**(Common Law Fraud)**

291.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

292.    Rehab Choice Corp., Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

293.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Rehab Choice Corp. was licensed to render professional medical services in New York, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was never licensed to render professional medical services in New York; (ii) in every claim, the representation that Rehab Choice Corp. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was unlawfully owned and controlled by non-medical professionals; (iii) in every claim, the representation that Rehab Choice Corp. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iv) in every claim, the representation that Rehab Choice Corp. was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it; (v) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (vi) in every claim, the representation that the billed-for services were performed by Rehab Choice Corp.'s employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

294.   Rehab Choice Corp., Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and

concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Rehab Choice Corp. that were not compensable under the No-Fault Laws.

295.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,278.77 pursuant to the fraudulent bills submitted by the Defendants through Rehab Choice Corp.

296.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

297.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Rehab Choice Corp., Hontiveros, and the Management Defendants
### (Unjust Enrichment)

298.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

299.    As set forth above, Rehab Choice Corp., Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

300.    When GEICO paid the bills and charges submitted by or on behalf of Rehab Choice Corp. for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

301.    Rehab Choice Corp., Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

302.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

303.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $65,278.77.

### FOURTEENTH CAUSE OF ACTION
### Against Roque and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

304.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

305.    NR Motion is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

306.    Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of NR Motion's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than sixteen months seeking payments that NR Motion was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault

benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7" and the sample medical bills annexed hereto as Exhibit "8".

307. NR Motion's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated NR Motion, inasmuch as NR Motion never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for NR Motion to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through NR Motion to the present day.

308. NR Motion is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. NR Motion likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by NR Motion in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

309. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $535,630.44 pursuant to the fraudulent bills submitted by the Defendants through NR Motion.

310.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Roque and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

311.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

312.    NR Motion is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

313.    Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the NR Motion enterprise.

314.    Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the NR Motion enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than sixteen months seeking payments that NR Motion was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the

76

Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7" and the sample medical bills annexed hereto as Exhibit "8".

315.    Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

316.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $535,630.44 pursuant to the fraudulent bills submitted by the Defendants through NR Motion.

317.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against NR Motion, Roque, and the Management Defendants
### (Common Law Fraud)

318.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

319.    NR Motion, Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and

concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

320.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that NR Motion was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that NR Motion was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that NR Motion was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it;   (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by NR Motion's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

321.   NR Motion, Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through NR Motion that were not compensable under the No-Fault Laws.

322.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $535,630.44 pursuant to the fraudulent bills submitted by the Defendants through NR Motion.

323.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

324.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Against NR Motion, Roque, and the Management Defendants
### (Unjust Enrichment)

325.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

326.    As set forth above, NR Motion, Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

327.    When GEICO paid the bills and charges submitted by or on behalf of NR Motion for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

328.    NR Motion, Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

329.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

330.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $535,630.44.

## EIGHTEENTH CAUSE OF ACTION
### Against Contreras-Cancio and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

331.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

332.    Synoptic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

333.    Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Synoptic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Synoptic was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative

sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9" and the sample medical bills annexed hereto as Exhibit "10".

334.   Synoptic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated Synoptic, inasmuch as Synoptic never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Synoptic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Synoptic to the present day.

335.   Synoptic is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. Synoptic likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Synoptic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

336.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $623,870.07 pursuant to the fraudulent bills submitted by the Defendants through Synoptic.

337.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against Contreras-Cancio and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

338.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

339.    Synoptic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

340.    Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the Synoptic enterprise.

341.    Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Synoptic enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than ten months seeking payments that Synoptic was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through

the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "9" and the sample medical bills annexed hereto as Exhibit "10".

342.    Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

343.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $623,870.07 pursuant to the fraudulent bills submitted by the Defendants through Synoptic.

344.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against Synoptic, Contreras-Cancio, and the Management Defendants
### (Common Law Fraud)

345.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

346.    Synoptic, Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

347.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Synoptic was properly licensed, and

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Synoptic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that Synoptic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it; (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by Synoptic's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

348.    Synoptic, Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Synoptic that were not compensable under the No-Fault Laws.

349.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $623,870.07 pursuant to the fraudulent bills submitted by the Defendants through Synoptic.

350.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

351.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Synoptic, Contreras-Cancio, and the Management Defendants
### (Unjust Enrichment)

352.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

353.   As set forth above, Synoptic, Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

354.   When GEICO paid the bills and charges submitted by or on behalf of Synoptic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

355.   Synoptic, Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

356.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

357.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $623,870.07.

### TWENTY-SECOND CAUSE OF ACTION
**Against Galdo and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

358.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

359.    Dunamis is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

360.    Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of Dunamis's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than six months seeking payments that Dunamis was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11" and the sample medical bills annexed hereto as Exhibit "12".

361.    Dunamis's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated Dunamis, inasmuch as Dunamis never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Dunamis to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Dunamis to the present day.

362.    Dunamis is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. Dunamis likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Dunamis in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

363.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $308,085.11 pursuant to the fraudulent bills submitted by the Defendants through Dunamis.

364.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Galdo and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

365.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

366.   Dunamis is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

367.   Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the Dunamis enterprise.

368.   Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Dunamis enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than six months seeking payments that Dunamis was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative

sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "11" and the sample medical bills annexed hereto as Exhibit "12".

369.    Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

370.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $308,085.11 pursuant to the fraudulent bills submitted by the Defendants through Dunamis.

371.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Dunamis, Galdo, and the Management Defendants
### (Common Law Fraud)

372.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

373.    Dunamis, Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

374.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Dunamis was properly licensed,

and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that Dunamis was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that Dunamis was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it; (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by Dunamis's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

375.    Dunamis, Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Dunamis that were not compensable under the No-Fault Laws.

376.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $308,085.11 pursuant to the fraudulent bills submitted by the Defendants through Dunamis.

377.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

378.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Dunamis, Galdo, and the Management Defendants
### (Unjust Enrichment)

379.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

380.     As set forth above, Dunamis, Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

381.     When GEICO paid the bills and charges submitted by or on behalf of Dunamis for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

382.     Dunamis, Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

383.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

384.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $308,085.11.

**TWENTY-SIXTH CAUSE OF ACTION**
**Against Rufino and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

385. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

386. LLJ Therapeutic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

387. Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of LLJ Therapeutic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four months seeking payments that LLJ Therapeutic was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described,

in part, in the chart annexed hereto as Exhibit "13" and the sample medical bills annexed hereto as Exhibit "14".

388.   LLJ Therapeutic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated LLJ Therapeutic, inasmuch as LLJ Therapeutic never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for LLJ Therapeutic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit new billing to GEICO through LLJ Therapeutic for the same Fraudulent Services, and continue to attempt collection on the fraudulent billing submitted through LLJ Therapeutic to the present day.

389.   LLJ Therapeutic is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to illegally split fees with non-medical professionals. LLJ Therapeutic likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by LLJ Therapeutic in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

390.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,329.36 pursuant to the fraudulent bills submitted by the Defendants through LLJ Therapeutic.

391.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-SEVENTH CAUSE OF ACTION
**Against Rufino and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

392.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

393.    LLJ Therapeutic is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

394.    Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 are employed by and/or associated with the LLJ Therapeutic enterprise.

395.    Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the LLJ Therapeutic enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than four months seeking payments that LLJ Therapeutic was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-medical professionals; (ii) it engaged in fee-splitting with non-medical professionals; (iii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (iv) the billed-for-services, in many cases, were not performed at all; (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vi) the Fraudulent Services were provided – to the extent they were provided at all – through a professional corporation that was ineligible to bill for or to collect no-fault benefits because it was nominally owned on paper by a medical professional who did not actually practice through

94

the professional corporation. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "13" and the sample medical bills annexed hereto as Exhibit "14".

396.    Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

397.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,329.36 pursuant to the fraudulent bills submitted by the Defendants through LLJ Therapeutic.

398.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against LLJ Therapeutic, Rufino, and the Management Defendants**
**(Common Law Fraud)**

399.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

400.    LLJ Therapeutic, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

401.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that LLJ Therapeutic was properly

licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by non-medical professionals; (ii) in every claim, the representation that LLJ Therapeutic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engaged in illegal fee-splitting with non-medical professionals; (iii) in every claim, the representation that LLJ Therapeutic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation was nominally owned on paper by a medical professional who did not actually practice through it;  (iv) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule, when in fact the billed-for services were performed and billed pursuant to a pre-determined, fraudulent protocol dictated by laypersons and designed to enrich the Defendants, and in many cases were not performed at all; and (v) in every claim, the representation that the billed-for services were performed by LLJ Therapeutic's employees, when in fact the billed-for services were performed – to the extent they were performed at all – by independent contractors.

402.    LLJ Therapeutic, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through LLJ Therapeutic that were not compensable under the No-Fault Laws.

403.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $751,329.36 pursuant to the fraudulent bills submitted by the Defendants through LLJ Therapeutic.

404.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

405.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against LLJ Therapeutic, Rufino, and the Management Defendants
### (Unjust Enrichment)

406.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

407.   As set forth above, LLJ Therapeutic, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

408.   When GEICO paid the bills and charges submitted by or on behalf of LLJ Therapeutic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

409.   LLJ Therapeutic, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

410.   Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

411.   By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $751,329.36.

### THIRTIETH CAUSE OF ACTION
**Against Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

412.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

413.   ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, Synoptic, Dunamis, and LLJ Therapeutic constitute an association-in-fact "enterprise" (the "Transient PT Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the Transient PT Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, ROM Medical, Rehabxpress, Rehab Choice Corp., NR Motion, Synoptic, Dunamis, and LLJ Therapeutic ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers. The Transient PT Enterprise has been operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Transient PT Enterprise acting individually or without the aid of each other.

414.   The Transient PT Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for

facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

415.    Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 each was employed by and/or associated with the Transient PT Enterprise.

416.    Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Transient PT Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over four years seeking payments that the Provider Defendants were not eligible to receive under the No-Fault Laws because: (i) they were unlawfully incorporated and/or owned and controlled by non-medical professionals; (ii) they engaged in fee-splitting with non-medical professionals; (iii) they billed for services performed by independent contractors; (iv) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent testing and billing protocol dictated by laypersons and designed to enrich the Defendants; (v) the billed-for-services, in many cases, were not performed at all; (vi) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (vii) the Fraudulent

Services were provided – to the extent they were provided at all – through professional corporations that were ineligible to bill for or to collect no-fault benefits because they were nominally owned on paper by medical professionals who did not actually practice through the professional corporations. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts and the sample bills annexed hereto as Exhibits "1" – "14".

417.    The Transient PT Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 operated the Transient PT Enterprise, inasmuch as the Provider Defendants never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Transient PT Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Provider Defendants to the present day.

418.    The Transient PT Enterprise is engaged in inherently unlawful acts, inasmuch as the Provider Defendants' very corporate existence is an unlawful act, considering that they were fraudulently incorporated, owned and controlled by non-medical professionals, and their existence therefore has depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The Transient PT Enterprise likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the

Transient PT Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

419.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,742,587.62 pursuant to the fraudulent bills submitted by the Defendants through the Provider Defendants.

420.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTY-FIRST CAUSE OF ACTION
**Against Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d)**

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

422.    Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Transient PT Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO.  These acts of mail fraud include, but are not limited to, those that are described in the charts and sample medical bills annexed hereto as Exhibits "1" – "14".

423.    Each member of the Transient PT Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

424.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,742,587.62 pursuant to the fraudulent bills submitted by the Defendants through the Provider Defendants.

425.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

426.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $233,382.35, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $233,382.35, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $233,382.35, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Zarhin, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $233,382.35 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $225,011.52, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $225,011.52, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $225,011.52, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Natividad, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $225,011.52 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be

determined at trial but in excess of $65,278.77, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,278.77, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $65,278.77, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Hontiveros, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $65,278.77 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $535,630.44, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $535,630.44, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be

determined at trial but in excess of $535,630.44, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against Roque, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $535,630.44 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $623,870.07, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.    On the Nineteenth Cause of Action against Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $623,870.07, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.    On the Twentieth Cause of Action against Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $623,870.07, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.    On the Twenty-First Cause of Action against Contreras-Cancio, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $623,870.07 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.    On the Twenty-Second Cause of Action against Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $308,085.11, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.      On the Twenty-Third Cause of Action against Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $308,085.11, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.      On the Twenty-Fourth Cause of Action against Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $308,085.11, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Galdo, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $308,085.11 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Z.      On the Twenty-Sixth Cause of Action against Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $751,329.36, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.    On the Twenty-Seventh Cause of Action against Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $751,329.36, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $751,329.36, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

CC.    On the Twenty-Ninth Cause of Action against Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, more than $751,329.36 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

DD.    On the Thirtieth of Action against Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,742,587.62, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

EE.    On the Thirty-First Cause of Action against Zarhin, Natividad, Hontiveros, Roque, Contreras-Cancio, Galdo, Rufino, Mikhalov, Seifer, Farberov, and John Doe Defendants 1-10, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,742,587.62, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: August 10, 2015

RIVKIN RADLER LLP

By:

Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Joshua D. Smith (JS 3989)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company and GEICO Casualty Co.*

3131370